UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                )
RIFAT M. CHEEMA d/b/a                           )
CHEEMA'S SUPERMARKET,                           )
                                                )
                    Plaintiff,                  )
                                                )
v.                                              )
                                                )        Civil Action No. 17-10055-JGD
UNITED STATES DEPARTMENT                         )
OF AGRICULTURE,                                 )
                                                )
                    Defendant.                  )
_____          )

## LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS[1]

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1, Defendant United

States Department of Agriculture, by and through its attorney, Andrew E. Lelling, the United

States Attorney for the District of Massachusetts, hereby submits the following statement of

undisputed material facts to which there is no genuine issue to be tried:

### The Supplemental Nutritional Assistance Program

1.      The Supplemental Nutrition Assistance Program ("SNAP" or the "Program") is

operated by the USDA under the Food Stamp Act (the "Act"), 7 U.S.C. §§ 2011 et seq.

Declaration of Gilda Torres, Section Chief of the USDA's Food and Nutrition Service's

Investigative Analysis Branch ("Torres Decl."), appended hereto at Attachment A, ¶ 1.  The

_____

[1] These facts are deemed undisputed for purposes of Defendant's Motion for Summary Judgment
only.  Defendant does not concede or rely upon these facts for any purpose other than this
motion, and specifically reserves the right to refute some or all of them at trial.  In addition,
while the information contained in this Rule 56.1 Statement, including the appended exhibits, is
relevant to this motion, Defendant reserves the right to object at trial to the introduction of any or
all of the information based on relevance, hearsay or any other reason set forth in the Federal
Rules of Evidence.

mission of SNAP is "to promote the general welfare and safeguard the health and well-being of the Nation's population by raising the levels of nutrition among low-income households." 7 U.S.C. § 2011; *see also* Torres Decl. ¶ 5.

2.      The Program is administered by the USDA's Food and Nutrition Service ("FNS" or the "Agency").  Torres Decl. ¶ 1.

3.      For the past several years, the Program has operated through the use of electronic benefit transfer ("EBT") cards issued to qualifying households.  Torres Decl. ¶ 6.

4.      The EBT card is used in the same way as a debit card.  Torres Decl. ¶ 6.

5.      Generally, a qualifying household's EBT account is credited monthly with the amount of benefits allocated.  Torres Decl. ¶ 6.

6.      Members of the household may then use the card to purchase food items eligible for purchase under SNAP at stores authorized to participate in the Program.  Torres Decl. ¶ 7.

7.      Food eligible for purchase under SNAP includes "any food or food product for home consumption except alcoholic beverages, tobacco and hot foods ready for immediate consumption . . . ."  7 U.S.C. § 2012(k); Torres Decl. ¶ 7.

8.      Retail food stores must be certified to participate in SNAP under regulations set forth in Title 7 of the Code of Federal Regulations at Part 278.  Torres Decl. ¶ 8.

9.      FNS determines a retailer's "store type" based on a combination of the information it provides to FNS with its application as further confirmed by Agency site visits. Torres Decl. ¶ 8.

10.      For instance, a convenience store ("CS") is a self-service store that offers a limited line of convenience items and is typically open long hours to provide easy access to customers.  Convenience stores are primarily engaged in retail sale of a variety of canned goods,

dairy products, pre-packaged meats and other grocery items in limited amounts.  Convenience

stores usually sell a large variety of products that are ineligible for SNAP, such as hot coffee,

alcohol or tobacco.  Torres Decl. ¶ 9.

11.    A combination grocery/other store ("CO"), on the other hand, has the primary

business of selling general merchandise but also sells a variety of food products.  Independent

drug stores, dollar stores and general stores are typically classified as CO stores.  Torres Decl.

¶ 9.

12.    A medium grocery store ("MG") is a store that carries a moderate selection of all

four staple food categories.  MGs may sell ineligible items as well, but their primary stock is

food items.  Torres Decl. ¶ 9.

13.    Supermarkets ("SM") are primarily engaged in the retail sale of an extensive

variety of grocery and other store merchandise.  This store typically has ten or more checkout

lanes with registers, bar code scanners, and conveyor belts.  Torres Decl. ¶ 9.

14.    Very large supermarkets are Super Store/Chain Stores ("SS").  They are primarily

engaged in the retail sale of a wide variety of grocery and other store merchandise.  SS includes

stores that are large food/drug combo stores and mass merchandisers under a single roof, and

membership retail/wholesale hybrids offering a limited variety of products in warehouse-type

environment.[2]  Torres Decl. ¶ 9.

15.    Pursuant to SNAP regulations, retail food stores may not accept EBT benefits as

payment for ineligible items, including alcohol, cigarettes, tobacco, lottery tickets, pet foods,

---

[2] There are several other store types, including but not limited to small grocery stores ("SG"),
specialty food stores selling fruits/vegetables ("FV"), meat/poultry products ("ME"), or seafood
products ("SE"), and wholesalers ("WH").  Torres Decl. ¶ 9.

soaps, paper products, household supplies, vitamins, medicines, and hot food (*i.e.*, prepared foods).  Torres Decl. ¶ 10.

16.     Any person who presents, or causes to be presented, any benefits for payment or redemption knowing the same to have been received, transferred, or used in any manner in violation of SNAP is subject to criminal or civil penalties.  Torres Decl. ¶ 11.

17.     In addition, the Act provides for the imposition of civil penalties and the disqualification of any retail store authorized to participate in SNAP that violates a provision of the statute or its implementing regulations.  Torres Decl. ¶ 11.

18.     Trafficking of SNAP benefits occurs, *e.g.*, when SNAP recipients sell their benefits for cash to food retailers, often at a discount.  Torres Decl. ¶ 12.

19.     Retailers are prohibited from exchanging EBT benefits for cash, regardless of whether the store discounts the benefits (for example, charging a customer $25 on his or her EBT card in exchange for a $20 bill).  7 C.F.R. § 271.2; Torres Decl. ¶ 12.

20.     In a typical transaction, a member of a qualified household swipes his or her EBT card in a specially programmed point-of-sale device issued to the authorized retailer.  Torres Decl. ¶ 13.

21.     Every purchase made with an EBT card is recorded in a national database maintained by the USDA.  Torres Decl. ¶ 13.

22.      The database electronically records every single EBT transaction made through data electronically transferred in every single entry (or "swipe") of an EBT card in each specially programmed "point-of-sale" electronic device required to process EBT transactions.  Torres Decl. ¶ 13.

23.     Among other things, the database records the date, time, and amount of each transaction and the store and household identification numbers involved in the transaction. Torres Decl. ¶ 13.

24.     The EBT terminal generates a receipt for each transaction, and the balance remaining in the recipient's account for the month is displayed on the receipt.  Torres Decl. ¶ 13.

25.     The national database produces various reports, including "ALERT"[3] reports which identify specific EBT transactions within a given period of time that fall within certain patterns that are statistically unusual and which suggest transactions that are in violation of SNAP.  Torres Decl. ¶ 14.

26.     The ALERT system records and tracks EBT transactions at every retail store participating in SNAP in the United States.  Torres Decl. ¶ 14.

27.     By running an ALERT Report for a given month, or for any given period of time, USDA FNS field officers can identify specific retailers and specific transactions in their region that fall within these patterns, as well as the specific data establishing the patterns.  Torres Decl. ¶ 15.

28.     Because the database records the date, time, and amount of each EBT transaction at each point-of-sale processing device, the amount of time between transactions and the amounts of these sales may be queried.  Torres Decl. ¶ 15.

29.     Given the inventory, size, and physical attributes of any given retailer, the dollar value, sequencing or time between entries may be indicative of trafficking.  Torres Decl. ¶ 16.

---

[3] Anti-Fraud Locator using EBT Retailer Transactions.  Torres Decl. ¶ 1.

30.     For example, multiple transactions made rapidly within minutes, multiple withdrawals from the same household account in unusually short timeframes, transactions that deplete most or all of a households' monthly benefits within an unusually short timeframe, and excessively large purchases from small retailers, who are not equipped with scanning devices or shopping carts and have limited counter space, are all activities that are often indicative of trafficking.  Torres Decl. ¶ 16.

31.     FNS monitors stores, conducts periodic reviews of stores' EBT data and ALERT reports and will initiate an investigation of a store when the Agency believes it is warranted by suspicious data.  Torres Decl. ¶ 17.

32.     FNS's Investigative Analysis Branch is responsible for initiating and conducting data-driven investigations.  Torres Decl. ¶ 17.

33.     When an investigation results in an agency action to disqualify a store, or assess a civil monetary penalty on the owner, Title 7 of the Code of Federal Regulations at Parts 278 and 279 provide for a system of administrative and judicial review.

34.     A retailer may request administrative review by an Administrative Review Officer ("ARO").  7 C.F.R. § 279.2; 7 U.S.C. § 2023(a)(3).

35.     If an administrative review is sought, the administrative action is held in abeyance until the ARO has made a determination, unless the penalty is permanent disqualification for trafficking. 7 C.F.R. § 279.4.

36.     In cases of a permanent disqualification for trafficking, the disqualification action is effective from the date the retailer receives notice of the disqualification.  7 U.S.C. § 2023(a)(18).

37.     Upon completion of the review, the ARO renders the final agency decision and notifies the retailer.  7 C.F.R. § 279.5; 7 U.S.C. § 2023(a)(5).

38.     After receiving notice of the final agency action, the retailer may then seek judicial review in federal court, where the Court will determine the validity of the administrative action.  7 U.S.C. § 2023(a)(13).

### Cheema's Supermarket

39.     Cheema's Supermarket ("Cheema's") is a medium grocery store selling food items as well as a variety of non-food goods located at 562 Cambridge Street in Allston, Massachusetts.  (*See* 2d Am. Compl.); Torres Decl. ¶ 18 (citing AR 0033-35).[4]

40.     Cheema's is a "storefront shop" located in a commercial area, with a sign reading:

> CHEEMA'S SUPER MARKET
> Pak., Ind. & Middle East Groceries & Fresh Halal Meat

Torres Decl. ¶ 19  (citing AR 0011, 0033-34).

41.     Cheema's is owned by three brothers:  Farhat Cheema, Nusrat Cheema and Plaintiff Rifat Cheema.  Torres Decl. ¶ 20 and Exhibit 1 and 2 thereto.

42.     Cheema's was authorized to participate in SNAP as a retailer in March 1997. Torres Decl. ¶ 21 (citing AR 0001).

43.     Based on the information contained on its application, Cheema's was initially classified as a small grocery store ("SG") and then, in 2011, reclassified as a combination grocery store/other ("CO").  Torres Decl. ¶ 22 (citing AR 0004).

---

[4] The certified Corrected Administrative Record ("Record") is incorporated by reference in the Torress Declaration.  It was previously filed via ECF as Document No. 38 and a courtesy copy was provided in paper and under seal to the Court.  The Record will be cited herein as "AR."

44.     In 2015, Cheema's was approximately 1300 square feet.  Torres Decl. ¶ 23(citing AR 0037).

45.     Cheema's retail transactions were conducted at a single cash register manned by either Farhat Cheema, Nusrat Cheema or Plaintiff Rifat Cheema.  There were no scanning devices.  The person manning the cash register would tally the cost of each purchase on a calculator.  Torres Decl. ¶ 24 (citing, *e.g.*, AR 0035).

46.     Cheema's offered for retail sale fish, poultry and meat, including goat, lamb, beef, chicken, and veal.  Torres Decl. ¶ 25 (citing, *e.g.,* AR 0013).

47.     Cheema's also sold meats wholesale, but was not authorized as a wholesaler under SNAP.  Torres Decl. ¶ 26 (citing AR 0202).

48.     In addition to meats, Cheema's offered many other inexpensive SNAP eligible items such as dairy products, bread/cereal and fruits/vegetables.  Some of these items appear in photographs in the Record.  Torres Decl. ¶ 27 (citing AR 0013; AR 0018-0032).

49.     There were also non-food items available for purchase at Cheema's.  (Torres Decl. ¶ 28 (citing AR 0006).

50.     In 2015, there were 10-15 handheld baskets available for customers to use, but no carts of any size.  Torres Decl. ¶ 29 (citing, *e.g.*, AR 0035).

## **FNS Investigation and Findings**

51.     Sometime before June of 2015, the ALERT system showed transaction patterns "consistent with possible EBT trafficking violations."  Torres Decl. ¶ 30 (citing AR 0033).

52.     As a result, FNS commenced an investigation.  Specifically, FNS analyzed Cheema's transactions for the months of June, July, and August 2015, and a contractor working

for FNS visited the store on September 28, 2015.  Torres Decl. ¶ 31(citing AR 0014-32, 0035-37).

53.    As a result of the contractor's observation of the store's inventory and stock during the September 28, 2015 store visit, Cheema's was reclassified as a medium grocery store ("MG").  Torres Decl. ¶ 32 (citing AR 0004).

54.    Following the data analysis and store visit, Program Specialist Richard O'Toole provided an extensive EBT Case analysis to his Section Chief, Gilda Torres.  Torres Decl. ¶ 34 (citing AR 0033-0060).

55.    In the Case Analysis, Mr. O'Toole weighed the physical location, layout, storage, inventory and available equipment against the suspicious transactions identified through the ALERT system, and also compared Cheema's transactions to the transactions at other COs and MGs.  Torres Decl. ¶ 34 (citing AR 0033-0060).

56.    On December 14, 2015, Gilda Torres, the Section Chief of the Agency's Retailer Operations Division for New England, sent Farhat Cheema and Plaintiff Rifat Cheema a "Charge Letter" setting forth the results of the investigation.  Torres Decl. ¶ 36 (citing AR 0061-63).

57.    The Charge Letter informed the Cheema brothers that the Agency was charging Cheema's with trafficking, and that the store was being considered for a permanent disqualification from the program as a result of the trafficking charge.  Torres Decl. ¶ 38 (citing AR 0061).

58.    The Charge Letter included attachments detailing the suspicious transactions that the Agency's three-month study had revealed.  These were grouped into four categories: (1) multiple transactions from any number of households being made too rapidly to be credible; (2) multiple transactions involving the same household being made in unusually short time

frames; (3) transactions in which all or a majority of a household's benefits were exhausted in unusually short time frames; and (4) transactions involving excessively large purchases.  Torres Decl. ¶ 39 (citing AR 0061).

59.     Specifically, Attachment 1 included 62 pairs of transactions made within 10 minutes or less.  Torres Decl. ¶ 41 (citing AR 0064-71).

60.     This included 16 transactions made in under 2 minutes, including 7 made in 90 seconds or less.  Most of these transactions were for hundreds of dollars.  Torres Decl. ¶ 41 (citing (AR 0064-71).

61.     In one instance, a transaction for $510.78 was completed in one minute and thirty-eight seconds.  Torres Decl. ¶ 41 (citing AR 0064).

62.     Another purchase for $270.49 was followed by another transaction of $378.42 less than two minutes later.  Torres Decl. ¶ 41 (citing AR 0065).

63.     Attachment 2 listed 62 instances in which the same household made multiple transactions in an unusually short timeframe (less than 18 hours).  Torres Decl. ¶ 42 (citing AR 0072-75).

64.     51 of these transactions occurred in less than 10 minutes.  Torres Decl. ¶ 51 (citing AR 0072-75).

65.     In Attachment 3, FNS included 110 occasions when an individual household exhausted the majority or all of its monthly benefits in an unusually short period of time.  Torres Decl. ¶ 43 (citing AR 0076-86).

66.     Of these 110 transactions, 45 of them were for *the exact amount* remaining on the shopper's EBT card.  Torres Decl. ¶ 43 (citing AR 0076-86).

67.     Finally, Attachment 4 listed 596 excessively large transactions for a store of the type and size of Cheema's.  Torres Decl. ¶ 44 (citing AR 0087-96).

68.     Of these 596 transactions, 5 were for more than $500, 18 were for more than $300, and 437 were for $100 or more.  Torres Decl. ¶ 44 (citing AR 0087-96).

69.     One transaction was for $899.58.  Torres Decl. ¶ 44 (citing AR 0087).

70.     In total, the Charge Letter and its attachments set out 830 violations.  Torres Decl. ¶ 45 (citing AR 0064-96).

71.     The Charge Letter invited Cheema's to submit evidence regarding the violations, providing the opportunity to present "any information, explanation, or evidence regarding these charges" either in writing or by phone to Program Specialist Richard O'Toole.  Torres Decl. ¶ 45(citing AR 0062-63).

72.     Cheema's received the Charge Letter on December 15, 2015, and had ten days in which to respond to the allegations.  Torres Decl. ¶ 46 (citing AR 0097).

73.     In a series of two faxes dated December 23 and December 25, 2015, Cheema's responded to the allegations in the Charge Letter.  Torres Decl. ¶ 47 (citing AR 0099-0137).

74.     In sum, Plaintiffs asserted in response to the Charge Letter:

- The review period covered the Muslim holy months of Ramzan and Haj, which are the store's busiest time of the year;

- The store's sales by credit cards were more than twice as much as SNAP EBT cards;

- Many Somalian customers order by phone and then come to Cheema's to pick up their order;

- These same customers also swipe their cards twice: once for the items they ordered by phone, and a second time for items they picked up once they got to the store; and

- Some of Cheema's customers come from far away and buy groceries for the month.

Torres Decl. ¶ 48 (citing AR 0100-0101).

75.     These contentions were supplemented by Cheema's credit card statements for the review period.  Torres Decl. ¶ 49 (citing AR 0103-0137).

76.     Plaintiff Rifat Cheema spoke to Mr. O'Toole on January 25, 2016, as memorialized in a letter from Ms. Torres to Rifat Cheema dated January 27, 2016.  Torres Decl. ¶ 50 (citing AR 0138).

77.     At Rifat Cheema's request, Mr. O'Toole granted additional time in which Cheema's could respond to the Charge Letter.  Torres Decl. ¶ 50 (citing AR 0138).

78.     Mr. O'Toole also requested that Rifat Cheema send copies of meat invoices and records of the telephone orders to him by February 1, 2016.  Torres Decl. ¶ 51 (citing AR 0138).

79.     On February 2, 2016, Mr. O'Toole received a 59-page fax consisting of copies of invoices for Cheema's purchases of meat.  Torres Decl. ¶ 51 (citing AR 0141-0197).

80.     Mr. O'Toole followed up with another request for additional information, this time asking Rifat Cheema to provide him with the invoices for non-meat food items by February 17, 2016.  Torres Decl. ¶ 52 (citing AR 0198).

81.     Cheema's provided the non-meat invoices on February 23, 2016.  Torres Decl. ¶ 52 (citing AR 0201; 0220).

82.     Upon review of the invoices, Mr. O'Toole excluded a total of 37 of 155 invoices provided by Cheema's from his analysis.  Torres Decl. ¶ 53 (citing, *e.g.*, GOV 0054-87).  Of the 37 excluded invoices, 10 were duplicates (GOV 0056-0065), and some of these were also outside the relevant period of June 2015 through August 2015; 8 were for purchases that fell outside the relevant period of June 2015 through August 2015 (GOV 0066-0076), and one of these was also a duplicate (compare GOV 0070 with GOV 0071); and 19 were excluded because they lacked

vendor names and could not be verified (GOV 0077-0087). *See also* Torres Decl. ¶ 53 (citing AR 0214).

83.     The Agency reviewed Plaintiff's submission, but found that the proffered explanations failed to adequately explain the suspect transactions.  Torres Decl. ¶ 54 (citing AR 0201-19).

84.     Specifically, the Agency determined that evidence supplied by Cheema's did not support the store's contention that 15-20 phone orders were placed each day.  Torres Decl. ¶ 55 (citing AR 0202).  Although Rifat Cheema told Mr. O'Toole that that phone sales were recorded in a notebook, Cheema's never submitted the notebook or any records at all reflecting phone sales.  Torres Decl. ¶ 55 (citing AR 0202-03).

85.     With respect to the store owners' contention that the high dollar figures of Cheema's sales are attributable to the fact that 70% of its sales are of fresh meat, even assuming that the volume of phone sales is accurate despite the lack of corroborating records, the Agency found that the refrigerated storage space in the store was insufficient for sales of thousands of dollars of fresh meat per day.  Torres Decl. ¶ 56 (citing AR 0205).

86.     Moreover, the Agency found that photos taken of the refrigerated storage space did not show anything like the amount of fresh meat that would support 15-20 phone orders.  Torres Decl. ¶ 57 (citing AR 0203).

87.     The store does not have shopping carts for its customers to use to carry orders to the counter for checkout.  As such, given the size of the suspicious transactions and the store owners' contention that a substantial portion of the sales are for fresh meat, it is difficult to see how the customers could carry the substantial amount of groceries to the counter if all the flagged transactions were legitimate.  Torres Decl. ¶ 58 (citing AR 0204-05).

88.     Mr. O'Toole noted that 18 of 62 transactions were for more than $300, and five were for more than $500.  Torres Decl. ¶ 59 (citing AR 0205).

89.     The Agency determined that, in the absence of carts, it is difficult to see how the groceries totaling hundreds of dollars could have been brought to the counter for purchase. Torres Decl. ¶ 59 (citing AR 0205).

90.     The Agency also found that the size of the checkout counter and the absence of scanners makes it difficult to see how 2 or more such large dollar-value transactions could have been completed in a matter of a few minutes.  Torres Decl. ¶ 59 (citing AR 0205).  A photograph of the counter as it existed in 2015 appears in the Administrative Record.  Torres Decl. ¶ 59 (citing AR 0025).

91.     Although it is possible that some of the store's customers shop in groups, the transaction data did not support the claim that there were multiple households using the same card.[5]  Torres Decl. ¶ 60 (citing AR 0206).

92.     The transaction data did not support the claim that repeat purchases from the same card took place because a SNAP-eligible household made a purchase and then returned for a few forgotten items; for instance, in several transaction sets the subsequent purchase was for approximately the same as or even more than the initial purchase.  Torres Decl. ¶ 60 (citing AR 0206-07).

93.     Cheema's provided no explanation for the transactions in which a household's SNAP allotment was substantially or entirely depleted in a short time frame – in some cases, in a

---

[5] Notably, if this were true, it may be evidence of trafficking by the EBT card holder – if for instance, a household was buying goods for non-eligible individuals in exchange for cash or other consideration – although it would not be conduct attributable to the retailer or part of the investigation of Cheema's.  *See, e.g.,* 7 C.F.R. § 271.2 (defining trafficking).

single transaction.  Torres Decl. ¶ 61 (citing AR 0207).  The Agency noted that a government study has shown that, on average, recipients take three weeks to spend 90% of their allotted monthly benefit.  Torres Decl. ¶ 61 (citing AR 0207).

94.     The claim that sales were unusually large because of the Muslim holy months of Ramzan (or Ramadan) and Haj were unsupported by fact.  In 2015, Haj was celebrated near the end of September, not August, so it is difficult to see how Haj-related sales would have driven business in August.  Torres Decl. ¶ 62 (citing AR 0208-09).

95.     In this litigation, Plaintiffs now assert that the holiday of Eid al-Fitr was cause for higher transactional amounts.  Torres Decl. ¶ 63 and Exhibit 2 thereto.  However, in 2015, that holiday – which marks the end of Ramadan – fell in mid-July, which would still not account for August irregularities.  Torres Decl. ¶ 63 (citing AR 0208).

96.     Additionally, as the Agency found, redemptions during the review period (June, July and August of 2015) were not significantly different from those in non-holiday months outside the review period.  Torres Decl. ¶ 64 (citing AR 0209).

97.     In fact, a review of Cheema's average monthly transactions for a full three-year period (2013, 2014, and 2015) shows that the months of June, July and August 2015 were not significantly higher than other months.  Torres Decl. ¶ 65 (citing GOV 0047)   Indeed, in May 2015 recorded the highest average transaction during the three-year period.  Torres Decl. ¶ 65 (citing GOV 0047).

98.     FNS found Cheema's explanation that many of the customers travelled long distances implausible, both because this is atypical SNAP household shopping behavior and because the items driving most of the store's sales – according to Cheema's itself – are highly-perishable fresh meat.  Torres Decl. ¶ 66 (citing AR 0209).

99.     The store's customers had access to other stores, both larger and better-stocked supermarkets, super stores, and large groceries and specialty stores stocking the same kind of ethnic food items sold at Cheema's.  Torres Decl. ¶ 67 (citing AR 0045a-45w; GOV 0039-46).

100.    Although the store owners claimed that food was delivered daily, Cheema's provided records showed fresh meat delivered on only 12 of 30 days in June.  Torres Decl. ¶ 68 (citing AR 0209).

101.    If the owners' estimate that 70% of sales were of fresh meat is accurate, Cheema's did not appear to have had sufficient stock on hand for the volume of claimed sales at the store.  Torres Decl. ¶ 69 (citing AR 0213).

102.    The 118 invoices[6] provided to substantiate purchases during the review period – plus a 40% markup for costs and profits – totaled $274,307.46 of eligible food items during the review period.  (AR 0214).  In other words, this figure represents the estimated sales figures for the inventory for which Cheema's provided documentation.  Torres Decl. ¶ 70.

103.    The actual sales, however, far exceeded that amount.  In fact, SNAP sales totaled $113,148.62, and credit sales totaled $310,007.10, for a total of $423,155.72, excluding cash sales.  Torres Decl. ¶ 70 (citing AR 0214).

104.    The Agency considered the Cheema's failure to demonstrate inventory for nearly $150,000 in sales over a three-month period as indicative of trafficking.  Torres Decl. ¶ 70 .

105.    Because Cheema's had not adequately addressed the Agency's concerns, FNS concluded that it was more likely true than not true that trafficking in SNAP benefits was occurring at Cheema's.  Torres Decl. ¶ 71 (citing AR 0219).

---

[6] *See supra* ¶¶ 78-82.

106.    During the administrative proceedings, Cheema's did not request consideration

for a trafficking civil monetary penalty ("CMP") in lieu of disqualification or provide any

supporting documentation indicating that it met the criteria for one.  Torres Decl. ¶ 72 (citing AR

0218-19).

107.    Nonetheless, as part of its review of the retailer response, the Agency considered

the store's eligibility for a CMP.  Torres Decl. ¶ 72 (citing AR 0218; 0248)

108.    Unsurprisingly, because Cheema's did not submit any evidence tending to show

that it qualified for a trafficking CMP, the Agency found that it was ineligible for one.  Torres

Decl. ¶ 72 (citing AR 0219).

109.    On April 27, 2016, FNS sent Plaintiff the Agency's decision letter, which stated

that FNS had determined that the alleged violations occurred at Cheema's and it would be

permanently disqualified from the Program on receipt of the letter.  Torres Decl. ¶ 73 (citing AR

0220-21).

110.    The letter also informed them that, while it had been considered for the CMP

rather than the permanent disqualification, Cheema's was not eligible because it had not

submitted "any evidence that they had established and implemented and effective compliance

policy and program to prevent violations of the Supplemental Nutrition Assistance Program."

Torres Decl. ¶ 73 (citing AR 0221).[7]

---

[7] In order to qualify for a CMP in lieu of disqualification, a retailer must meet the following four
criterion:

> Criterion 1. The firm shall have developed an effective compliance policy as
> specified in § 278.6(i)(1); and

> Criterion 2. The firm shall establish that both its compliance policy and program
> were in operation at the location where the violation(s) occurred prior to the
> occurrence of violations cited in the charge letter sent to the firm; and

111.    Cheema's was advised of its appeal rights to the Agency's Administrative Review Branch ("ARB"), together with the contact information for the appeal and notification that the appeal must be filed within ten days of receiving the final decision.  In accordance with this decision, the EBT terminal at Cheema's was to be turned off by its vendor on receipt of the letter.  Torres Decl. ¶ 74 (citing AR 0221).

112.    The letter was received on April 28, 2016.  Torres Decl. ¶ 74 (citing AR 0222-23).

113.    In a letter dated May 3, 2016, Plaintiff Rifat Cheema formally requested review of the Agency decision by the ARB.  Torres Decl. ¶ 75 (citing AR 0224-25).

---

Criterion 3. The firm had developed and instituted an effective personnel training program as specified in § 278.6(i)(2); and

Criterion 4. Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations; or it is only the first occasion in which a member of firm management was aware of, approved, benefited from, or was involved in the conduct of any trafficking violations by the firm. Upon the second occasion of trafficking involvement by any member of firm management uncovered during a subsequent investigation, a firm shall not be eligible for a civil money penalty in lieu of permanent disqualification. Notwithstanding the above provision, if trafficking violations consisted of the sale of firearms, ammunition, explosives or controlled substances, as defined in 21 U.S.C. § 802, and such trafficking was conducted by the ownership or management of the firm, the firm shall not be eligible for a civil money penalty in lieu of permanent disqualification. For purposes of this section, a person is considered to be part of firm management if that individual has substantial supervisory responsibilities with regard to directing the activities and work assignments of store employees. Such supervisory responsibilities shall include the authority to hire employees for the store or to terminate the employment of individuals working for the store.

7 C.F.R. § 278.6(i).

114.    The letter was received by FNS on May 10, 2016, and on May 11, 2016, ARO Ronald Gwinn sent Plaintiff a letter acknowledging receipt of the request for review.  Torres Decl. ¶ 75 (citing AR 0230).

115.    Mr. Gwinn advised Plaintiff Rifat Cheema that his request for review was timely and that he had been assigned to the case.  Torres Decl. ¶ 76 (citing AR 0230).  He further requested that Cheema's provide information in support of its position within three weeks, and advised Plaintiff Rifat Cheema that in the absence of information showing the grounds on which the review is being sought that the review would not be conducted.  Torres Decl. ¶ 76 (citing AR 0230).

116.    Plaintiffs did not submit any further response.  Torres Decl. ¶ 77 (citing AR 0001-0251).

### Final Agency Decision

117.    Nonetheless, ARO Gwinn reviewed the case and determined that it was more likely true than not true that trafficking in SNAP benefits had occurred at the store.  Torres Decl. ¶ 78 (citing AR 0235).

118.    On July 8, 2016 the Agency issued its Final Agency Decision, which stated that the record on review indicated that the Program violations did occur as charged and which affirmed the permanent disqualification of Cheema's from SNAP.  Torres Decl. ¶ 79 (citing AR 0235-49).

119.    In addition, after a thorough review of the administrative record and Cheema's proffered explanations for the suspect transactions following both the Charge Letter and the decision letter, Mr. Gwinn determined that the penalty was proper.  Torres Decl. ¶ 79 (citing AR 0248-49).

120.    In reference to the first category of suspicious transactions (transactions made too rapidly to be credible), Mr. Gwinn noted the limited counter space, the lack of evidence of phone orders, and the logistics involved in completing SNAP transactions as factors in FNS's conclusion that these transactions were credible indicia of trafficking in SNAP benefits.  Torres Decl. ¶ 80 (citing AR 0245).

121.    He also noted the lack of sufficient storage space for the volume of phone orders that Cheema's claimed was the cause of so many rapid transactions.  Torres Decl. ¶ 80 (citing AR 0245).

122.    Regarding the second category of suspicious transactions (multiple transactions from the same account in short time frames), Mr. Gwinn found that the evidence provided by Cheema's did not adequately support its explanations for the unusual purchasing patterns observed in the transaction reports.  Torres Decl. ¶ 81 (citing AR 0246).

123.    First, Mr. Gwinn found it implausible that a SNAP-eligible household would share those limited benefits with other households with any frequency.  Torres Decl. ¶ 81 (citing AR 0246).[8]

124.    Second, Mr. Gwinn also concluded that the evidence of the transactions did not support Plaintiff's contention that households would have multiple transactions in a short period of time because they had forgotten a few items when they made their initial purchase, because the record of transactions in Charge Letter Attachment 2 showed unusually large second transactions even considered on their own.  Torres Decl. ¶ 81 (citing AR 0246).  In 11 of the transactions, the later purchase was for above or higher the amount of the first purchase.  Torres Decl. ¶ 81 (citing AR 0072-75).

---

[8] *See supra* note 5.

125.     Mr. Gwinn noted that Cheema's did not provide any explanation for why so many households shopping at Cheema's exhausted all or substantially all of their benefits in a short time frame, as listed in the third category of irregular transactions.  Torres Decl. ¶ 82 (citing AR 0246).  Citing to a 2005 report on SNAP household shopping habits, he noted that this shopping pattern is very unusual and, absent some plausible alternate explanation, indicative of trafficking. (*Id.*)

126.     Regarding the fourth category of suspect transactions (those for excessively large dollar amounts), Mr. Gwinn noted that the average SNAP transaction for a medium grocery store in Massachusetts during the review period was $16.02, and that Cheema's Supermarket had 596 transactions during the review period for $47.50 or higher, or 300% more than the average transaction for the store type.  Torres Decl. ¶ 83 (citing AR 0247).

127.     In addition, a review of the average monthly transactions at Cheema's as compared to other stores that sell Halal meats reveals that, during June, July and August of 2015, Cheema's shoppers spent more than *double* per transaction than shoppers spent at any other store:

| STORE NAME | AVERAGE TRANSACTION |
|---|---|
| Cheema's | $134.99 |
| ███████████████ | $50 |
| ███████████████ | $35.28 |
| ███████████████ | $54.31 |
| ████████ ██████ | $47.83 |

---

[9] There is no data for this store for June 2015, so the average is only of the monthly transactions during July and August 2015.

| STORE NAME | AVERAGE TRANSACTION |
|---|---|
| ███████████ | $40.12 |
| ███████████████ | $37.86 |

Torres Decl. ¶ 84 and Exhibit 4 thereto.

128.   Mr. Gwinn noted that despite the proffered explanation of unusually large holiday purchases, the amount of SNAP redemptions at the store stayed fairly consistent throughout the year.  Torres Decl. ¶ 85 (citing AR 0247 and GOV 0047) (listing, *inter alia*, average transaction amounts for Cheema's from January 2013 through December 2015).

129.   He also noted that Cheema's customers seem to have had regular access to larger, better-stocked stores as well as other specialty food stores.  Torres Decl. ¶ 86 (citing AR 0247)

130.   Indeed, individuals shopping at Cheema's shopped at other larger and comparable stores during the relevant time period, and spent far less money.  Torres Decl. ¶ 86 and Exhibits 5 and 6 thereto.

131.   For instance, in June 2015, one household spent $481.84 at Cheema's on 6/14, which far exceeded the amounts spent at ████████ ($162.74 on 6/13) and ████████ ████████████████ during the same month ($33.88 on 6/7).  Torres Decl. ¶ 87 and Exhibit 5 thereto (citing AR 0045c).

132.   In July 2015, another household spent $481.65 at Cheema's, which is more than two and a half times the amount spent at ███ ($173.40 on 7/21) and ███████████████ ($139.45 and 4.35 on 7/16) that same week.  Torres Decl. ¶ 87 and Exhibit 5 thereto (citing AR 0045f).

133.   In August 2015, one household spent an even $500.00 at Cheema's on 8/20, which was nearly five times the amount it spent at any other store during the same month,

including ████ and ██████. Torres Decl. ¶ 87 and Exhibit 5 thereto (citing AR 0045h-45i).

134.    Mr. Gwinn also observed that Cheema's took deliveries of fresh meat on only 12 of 30 days in June, which did not support Plaintiff's claim that 70% of the store's sales were for fresh meat.  Torres Decl. ¶ 88 (citing AR 0247).

135.    Finally, Mr. Gwinn turned to the invoices submitted by Plaintiff, and concluded that they were insufficient to adequately explain the volume of SNAP transactions at the store. Torres Decl. ¶ 89 (citing AR 0248).

136.    Noting that the inventory receipts during the review period, plus a 40% markup, totaled $274,307.46, and Plaintiff's representation that only 25% of his sales came from SNAP transactions, he concluded that the expected volume of SNAP sales at the store during the review period – based on Plaintiff's own representations – would amount to approximately $68,600. Torres Decl. ¶ 89 (citing AR 0248).

137.    The actual figure for SNAP sales was $113,148.62, or nearly twice what the inventory and business model would predict, and Mr. Gwinn considered this to be additional support for the Agency's determination that it was more likely true than not true that trafficking in SNAP benefits took place at Cheema's.  Torres Decl. ¶ 89 (citing AR 0248).

138.    The Final Agency Decision concludes that the analysis of the EBT transaction records provided substantial evidence that the questionable transactions during the review period had characteristics consistent with trafficking, and therefore "based on a review of all the evidence in this case, it is more likely true than not true that program violations did in fact occur as charged by Retailer Operations" and sustained the decision to impose a permanent

disqualification on Cheema's.  Torres Decl. ¶ 90 (citing AR 0248-49).

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:    */s/ Jessica P. Driscoll*
        Jessica P. Driscoll, BBO No. 655394
        Assistant United States Attorney
        United States Attorney's Office
        John Joseph Moakley U.S. Courthouse
        1 Courthouse Way - Suite 9200
        Boston, MA  02210
        (617) 748-3398
Dated: August 22, 2018          Jessica.Driscoll@usdoj.gov

## CERTIFICATE OF SERVICE

        I hereby certify that this document filed through the ECF system will be sent electronically
to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper
copies will be sent to those indicated as non-registered participants by First Class Mail.

                        */s/ Jessica P. Driscoll*
                        Jessica P. Driscoll
Dated: August 22, 2018          Assistant United States Attorney