UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RIFAT M. CHEEMA d/b/a/     )
CHEEMA'S SUPERMARKET     )
                          )
          Plaintiff,     )       CIVIL ACTION
      v.                )       NO. 17-10055-JGD
                          )
UNITED STATES,           )
                          )
          Defendant.     )

# MEMORANDUM OF DECISION AND ORDER
## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

March 12, 2019

DEIN, U.S.M.J.

## I. INTRODUCTION

This matter is before the court on the defendant the United States Department of

Agriculture's ("USDA") Motion for Summary Judgment. (Docket No. 52). The plaintiff Rifat M.

Cheema d/b/a/ Cheema's Supermarket ("Cheema's") has filed this action against the USDA in

order to contest an agency ruling which found that Cheema's likely trafficked in Supplemental

Nutrition Assistance Program benefits, and which disqualified Cheema's from participating in

that program. Cheema's bears the burden of proving by a preponderance of the evidence at

trial that the agency's ruling was incorrect. To survive summary judgment, Cheema's must

present credible evidence at this stage of the case on which a jury could reasonably find for

Cheema's at trial. For the reasons herein, the court rules that Cheema's fails to make that

showing.  This court, therefore, ALLOWS the USDA's Motion and grants summary judgment in its favor.

## II.  **STATEMENT OF FACTS**[1]

The following facts are undisputed unless otherwise indicated.[2]

### SNAP Benefits

The Supplemental Nutrition Assistance Program ("SNAP"), established through the Food Stamp Act, 7 U.S.C. § 2011, *et seq.*, is intended "to promote the general welfare, [and] to safeguard the health and well-being of the Nation's population by raising the levels of nutrition among low-income households."  7 U.S.C. § 2011.  (DF ¶ 1).  SNAP is operated by the Food and Nutrition Service ("FNS" or the "Agency").  (Id. ¶ 2).  Through SNAP, eligible participants are

---

[1] Unless otherwise indicated, the facts are derived from the defendant's "Local Rule 56.1 Statement of Undisputed Facts" (Docket. No. 54) ("DF"), the identical affidavits of Farhat M. Cheema, Rifat M. Cheema, Nusrat Cheema, and Ishrat Cheema (Docket No. 63-1 at 1-16) (collectively, the "Owners' Aff."), the affidavits of Asim Sadig and Isam (Docket No. 63-1 at 17-19) (together, the "Customers' Aff."), and the Corrected Administrative Record (Docket No. 38) ("A.R.").  The court acknowledges the USDA's argument that the Customers' Affidavit should not be considered because the identities of the two individuals were never disclosed to the defendant pursuant to Fed. R. Civ. P. 26(a)(1)(A)(i).  As Cheema's fails to submit evidence necessary to meet their burden even with the Customers' Affidavit, this court need not make a legal ruling on the Affidavit's admissibility.

[2] Cheema's has failed to render a statement of facts in compliance with this court's local rules.  See L.R. 56.1 ("Opposition[s] to motions for summary judgment must be filed, unless the court orders otherwise, within 21 days after the motion is served.  A party opposing the motion shall include a concise state-ment of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation.").  Where the opposing party does not submit a statement of facts in compliance with Local Rule 56.1, the defendant's facts are deemed admitted.  Id. ("Material facts of record set forth in the statement required to be served by the moving party will be deemed for purposes of the motion to be admitted by opposing parties unless controverted by the statement required to be served by opposing parties."); Brown v. Armstrong, 957 F. Supp. 1293, 1297-98 (D. Mass. 1997).  The factual section of Cheema's Memorandum (Docket No. 63) ("Pl. Mem.") cites largely to the defendant's Rule 56.1 Statement.  However, in that same factual section, Cheema's also inserts citations to certain pieces of evidence attached to its Memorandum.  As set forth below, this court will consider the evidence submitted in this fashion, but otherwise deems the defendant's submitted facts to be true unless directly contradicted by evidence submitted by Cheema's.

allotted funds to spend on certain food items.  SNAP funds are used by beneficiaries through electronic benefit transfer or "EBT" cards, which are loaded monthly and operate in a similar fashion to debit cards.  (Id. ¶¶ 3-5).

EBT cards can be used at approved stores on approved items.  (Id. ¶ 6).  For example, SNAP regulations provide that certified retail stores cannot accept EBT benefits for particular goods including alcohol, cigarettes, tobacco, lottery tickets, pet foods, soaps, paper products, household supplies, vitamins, medicines, and hot prepared foods.  (Id. ¶ 15).  FNS certifies stores to participate in the program and classifies each store based on its size and the types of goods sold.  (See id. ¶¶ 8-14).

A retail store that violates SNAP regulations may be subject to civil penalties or disqualification from the program.  (Id. ¶ 17).  One such regulation is the prohibition on retail stores from exchanging EBT benefits for cash, which is considered trafficking.  (Id. ¶¶ 18-19).  Regulators monitor EBT transactions in order to detect suspicious behavior.  All EBT transactions are recorded in a database maintained by the USDA.  (Id. ¶ 21).  The database records the date, time, and amount of each transaction, and the store and household identification numbers related to each.  (Id. ¶23).  The balance remaining in each beneficiary's account is also recorded after each transaction.  (Id. ¶ 24).  The database has the capacity to produce certain reports of suspicious activity known as "Anti-Fraud Locator using EBT Retailer Transactions," or "ALERT" reports.  (Id. ¶ 25).  FNS, and its Investigative Analysis Branch, is responsible for monitoring stores and investigating suspicious activity.  (Id. ¶¶ 31-32).

If an investigation results in disciplinary action by FNS, administrative and judicial review is conducted pursuant to 7 C.F.R. §§ 278, 279.  Where, as here, FNS permanently disqualifies a

store for trafficking benefits, the disqualification is effective from the date the retailer receives notice of the decision. 7 U.S.C. § 2023(a)(18). A retailer may request review of a penalty from an Administrative Review Officer ("ARO"). 7 U.S.C. § 2023(a)(3); 7 C.F.R. § 279.2. The ARO is then charged with making a final agency determination. 7 U.S.C. § 2023(a)(5); 7 C.F.R. 279.5. Once that final determination has been made, a retailer can seek review in federal court. 7 U.S.C. § 2023(a)(13).

### Cheema's

Cheema's is a grocery store located in Allston, Massachusetts. (DF ¶ 39). Brothers Farhat, Nusrat, and Rifat Cheema own the store. (Id. ¶ 41).[3] In March of 1997, Cheema's became authorized to accept SNAP benefits. (Id. ¶ 42). Cheema's was approved to accept SNAP benefits as a retail store, but not as a wholesaler. (Id. ¶ 47). Cheema's originally was classified as a "small grocery store" for SNAP purposes and was later reclassified as a "combination store/other" in 2011. (Id. ¶ 43). In 2015, based on the store's inventory and stock, Cheema's was reclassified as a "medium grocery store." (Id. ¶ 53). The store is approximately 1300 square feet, has a single cash register, and has no scanning devices. (Id. ¶¶ 44-45). Cheema's offers customers small handheld baskets as opposed to large shopping carts. (Id. ¶ 50). At all times, one of the Cheema brothers works the cash register and uses a calculator to tally purchases. (Id. ¶ 45).

Cheema's claims that since the store's inception, Cheema's has attracted loyal customers who travel long distances to shop at the store. (Owners' Aff. ¶ 4). Cheema's asserts

---

[3] In his affidavit, brother Ishrat Cheema asserts that he is also a part owner. (Owners' Aff. at 13).

that the store specializes in unique Halal meats, much of which is sold at a significant markup. (Id. ¶¶ 4, 10).  The store alleges that its customers often buy Halal meat for an entire month at once, quickly depleting an individual's SNAP benefits for that given month.  (Id. ¶¶ 11, 14; Customers' Aff. ¶ 6).  While the store has no carts for customers, Cheema's avers that one of the owners carries meat orders to the checkout counter for customers and that most orders fit within typical shopping bags.  (Owners' Aff. ¶ 9).  Cheema's alleges that "[m]any of our customers place orders with us over the phone, and then come in at a later time to pick up their order.  When the customers arrive, [Cheema's] already [has] the total price of their purchase calculated."  (Id. ¶ 12).  Since the purchases are pre-tallied, Cheema's asserts that it is common for customers to "make purchases beyond the meat.  Oftentimes, these customers swipe their cards twice: once for the items ordered by phone, and a second time for the items picked up in-person."  (Id.; Customers' Aff. ¶ 3).  In order to keep track of the large amount of phone orders placed by customers, Cheema's avers that the brothers use a notebook, replaced about every three months.  (Pl. Mem. at 9-10 (referencing Cheema's most recent phone book, submitted as Ex. C and produced to the court at Docket No. 65)).

## The Trafficking Investigation

Before June of 2015, the USDA's ALERT system discovered suspect transactions from Cheema's.  (DF ¶ 51).  Thereafter, FNS commenced an investigation into potential trafficking. (Id. ¶ 52).  FNS began by analyzing transaction data for Cheema's in the months of June, July, and August of 2015.  (Id.).  On September 28, 2015, an FNS contractor visited Cheema's, where he observed Cheema's inventory and stock.  (Id. ¶¶ 52-53).  After the store visit, Program Specialist Richard O'Toole provided his Section Chief, Gilda Torres, an analysis weighing

Cheema's location, layout, storage capabilities, inventory, available equipment, the trans-actions tracked by the ALERT reports, and a comparison between Cheema's transactions and those of comparable stores.  (Id. ¶¶ 54, 55).

Following Specialist O'Toole's report, Section Chief Torres sent Farhat Cheema and Rifat Cheema a "Charge Letter" explaining the investigation and charging Cheema's with SNAP benefit trafficking.  (Id. ¶¶ 56, 57).  The letter informed the brothers that the Agency was considering disqualifying Cheema's from SNAP as a result of the alleged conduct.  (Id.).  The Charge Letter detailed the suspicious transactions underlying the decision, and grouped suspicious activity into four categories.  (Id. ¶ 58).  The trafficking charge was based on: (1) multiple transactions made too rapidly to be credible; (2) multiple transactions made from individual accounts in short time frames; (3) transactions where all or most of an allotment of benefits were used in a short time frame; and (4) unusually large transactions.  (Id.).  The Charge Letter accused Cheema's of 830 individual violations.  (Id. ¶ 70).  The Charge Letter allowed for Cheema's to submit evidence combatting the allegations.  (Id. ¶ 71).  Cheema's responded with two fax submissions.  (Id. ¶ 73).

In responding to the allegations, Cheema's alleged that: (1) the store was exceptionally busy during the period they were under review because of the Muslim holy months of Ramzan and Haj; (2) Cheema's credit card sales were more than twice that of EBT transactions; (3) many Somali customers order by phone and then pick up their orders in the store; (4) many customers who swipe their EBT cards realize they have a balance and make another transaction; (5) some of Cheema's customers travel long distances for Cheema's goods and buy groceries at once for the entire month; and (6) customers often shop in groups and swipe the same card for

multiple purchases. (Id. ¶ 74; A.R. 100-101). Cheema's also submitted credit card statements for the months of the investigation to support their claims. (DF ¶ 75).

After submitting their objections to the allegations and associated evidence, Mr. Rifat Cheema spoke with Specialist O'Toole who requested copies of meat invoices and records of telephone orders. (Id. ¶¶ 76-78). Cheema's provided the meat invoices and, after a subsequent request from Specialist O'Toole, also submitted non-meat invoices for review. (Id. ¶¶ 79-81). It does not appear from the record that Cheema's ever submitted the requested phone evidence for review. (Id. ¶ 84). Cheema's now submits a more recent notebook of phone orders as an example of how Cheema's tracks phone orders and the type of volume the store experiences. (Docket No. 65).

The Agency reviewed Cheema's submitted responses and evidence[4], and ultimately concluded that the rendered explanations failed to explain the suspicious transactions. (DF ¶ 83). Specifically, the Agency found that the evidence did not support the proffered statement that Cheema's received 15-20 phone orders each day, and did not refute the Agency's conclusions that the store's small checkout counter and lack of carts for customers did not support the contention that large purchases were frequently made, that the store's lack of scanners did not support the idea that multiple large purchases could be completed in quick succession, that the holy months did not explain the high sales in August of 2015, that the store's EBT transaction amounts during the holy months matched those of other months during the year, that

---

[4] Of the 155 submitted invoices, Specialist O'Toole excluded 37 from his review. The reasons cited were duplicate invoices, invoices falling outside of the review period, and invoices that lacked a vendor name or that otherwise could not be verified. (DF ¶ 82).

Cheema's assertion that many customers traveled long distances to pick up groceries was not credible, that the physical storage space and observed inventory did not support the assertion that most of Cheema's sales were of fresh meat, and finally that Cheema's reported inventory did not account for Cheema's actual reported sales.  (Id. ¶¶ 84-104).  The Agency concluded that it was more likely than not that Cheema's had engaged in trafficking.  (Id. ¶ 105).

On April 27, 2016, FNS sent Cheema's a letter including its decision and disqualifying Cheema's from SNAP.  (Id. ¶ 109).  The plaintiff requested review of the decision by FNS' Administrative Review Branch ("ARB") on May 3, 2016.  (Id. ¶ 113).  ARO Ronald Gwinn was assigned to the case and asked the plaintiff for information in support of Cheema's position.  (Id. ¶ 115).  He informed Cheema's that if such documentation was not provided within a three-week period, no review would occur.  (Id.).  Cheema's did not submit the requested information.  (Id. ¶ 116).  ARO Gwinn reviewed the case nonetheless and determined that it was more likely true than not that Cheema's had engaged in trafficking.  (Id. ¶ 117).  The final Agency decision affirmed the disqualification of Cheema's from SNAP.  (Id. ¶ 118).

Cheema's filed their Second Amended Complaint in federal court on September 11, 2017.  (Docket No. 23).  Therein, Cheema's sought "*de novo* review of the USDA's Final Agency Determination and request[ed] that the Court reverse the determination barring [Cheema's] from the SNAP program as an authorized retailer."  (Id. at 3).  The USDA filed the Motion for Summary Judgment on August 22, 2018.  (Docket No. 52).  After briefing from the parties, the court held a hearing on the motion on December 13, 2018.

Additional facts will be provided herein where appropriate.

**III.     ANALYSIS**

**A.     Summary Judgment Standard of Review**

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" PC Interiors, Ltd. v. J. Tucci Constr. Co., 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)) (additional citation omitted).  The burden is upon the moving party to show, based upon the discovery and disclosed materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Material facts are those that "possess[] the capacity to sway the outcome of the litigation under the applicable law[,]" and there is a genuine dispute where an issue "may reasonably be resolved in favor of either party." Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (internal quotation and citation omitted).  The court must "review the material presented in the light most favorable to the non-movant, and [] must indulge all inferences favorable to that party." Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st Cir. 1990) (internal quotation and citation omitted).

When a properly supported motion for summary judgment is made, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (internal quotation and citation omitted).  The non-moving party can then avoid summary judgment only by providing properly supported evidence of disputed material facts. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993).  A party may not rely on "conclusory allegations, improbable inferences, [or] unsupported speculation" to overcome a motion for summary

judgment.  <u>Crawford v. Lamantia</u>, 34 F.3d 28, 31 (1st Cir. 1994) (internal quotation and citation omitted).

      **B.**    **<u>Standard of Review in SNAP Cases</u>**

A party aggrieved by a final FNS determination "may obtain judicial review thereof by filing a complaint against the United States in the United States Court for the district in which it resides or is engaged in business . . . requesting the court to set aside such determination."  7 U.S.C. § 2023(a)(13).  The district court then determines the validity of the FNS decision by trial *de novo*.  7 U.S.C. § 2023(a)(15).  When reviewing an FNS decision under 7 U.S.C. § 2023, the court's review is broader than that normally associated with agency review under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.*, "since it requires the Court to examine all the issues raised and not merely to determine whether the administrative findings are supported by substantial evidence on the record.  The Court must reach its own factual and legal conclusions and is not limited to matters considered in the administrative proceedings."  <u>Ramirez v. United States</u>, 514 F. Supp. 759, 763 (D.P.R. 1981); <u>see</u> <u>also</u> <u>Irobe v. U.S. Dep't of Agric.</u>, 890 F.3d 371, 376 (1st Cir. 2018).  The Court "give[s] no weight to the agency's finding that trafficking occurred."  <u>Irobe</u>, 890 F.3d at 379.

The burden of proof in a lawsuit under 7 U.S.C. § 2023 is on the store disputing FNS' decision.  <u>Id.</u> at 374.  Where evidence of trafficking has been submitted by the government agency, "summary judgment is warranted if a nonmovant who bears the burden on a dispositive issue fails to identify 'significantly probative' evidence favoring his position."  <u>Id.</u> at 377 (citing <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511, 9 L. Ed. 2d 202 (1986)).  In explaining the placement of the burden of proof, the First Circuit reasoned that "a

store is in the best position to show what actually happens on its premises.  Allocating the burden of proof to the store tacitly recognizes this reality and, in the bargain, incentivizes shopkeepers to maintain accurate records of all SNAP transactions.  A contrary rule would have the perverse effect of rewarding businesses for shoddy record-keeping." Id. at 378.

In evaluating evidence of trafficking, the court need not have direct evidence in order to grant summary judgment for the agency; the court may rely on circumstantial evidence created by EBT data. Kahin v. United States, 101 F. Supp. 2d 1299, 1303-1304 (S.D. Cal. 2000) ("While it is true that there are no published opinions which rely primarily on evidence generated from EBT data, the statute clearly intended that EBT data be used for this purpose.  Reliance on evidence garnered 'through a transaction report under an electronic benefit transfer system' is explicitly recognized under the statute.  7 U.S.C. § 2021(a).  It may well be easier for a Plaintiff to rebut the inference of EBT data than evidence of 'red-handed' violations, but this does not mean that the FNS cannot rely on it where, as here, the Plaintiff has failed to rebut or raise material issues of fact as to the logical inferences from the data."); see also Famous Int'l Mkt. v. United States, No. 17-4897, 2018 WL 3015249, at *9 (E.D. Pa. June 15, 2018) ("The Service may find a store committed a SNAP violation and disqualify it based on facts established through on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an electronic benefit transfer system." (citing 7 C.F.R. § 278.6(a)) (internal quotations omitted)).  "Congress has expressly authorized consideration of both transaction information gleaned from EBT databases and reports of on-site investigations as tools in the USDA's efforts to detect fraud." Irobe, 890 F.3d at 379.  "As a general matter, such information and reports may be probative of trafficking: in appropriate cases, they may be sources of circum-

stantial evidence of fraud, sufficient to prove that a store is trafficking in SNAP benefits." Id. "The USDA is charged with ensuring that merchants and food-stamp recipients alike color between the lines. When the evidence suggests that program rules are being flouted, agency action is appropriate." Id. at 381. Accordingly, this court will evaluate the evidence submitted, whether direct or circumstantial, in ruling on the instant summary judgment motion.

Furthermore, although stores may be permanently disqualified based on "the first occasion of trafficking[,]" 7 U.S.C. § 2021(b)(3)(B), the First Circuit has not adopted the stricter viewpoint adhered to by some other Circuits which requires an opponent of summary judgment in SNAP benefit cases to raise a specific material issue in response to each alleged violation. Instead, the First Circuit in Irobe remained open to the idea that multiple transactions could be rebutted by the same rationale. Irobe, 890 F.3d at 380 n.3. However, each set of alleged violations must still be explained. Thus, if a store can rebut one set of alleged violations, but not raise a genuine issue as to the others, that is not enough to survive summary judgment because unrebutted instances of trafficking remain. See Duchimaza v. United States, 211 F. Supp. 3d 421, 433 (D. Conn. 2016) ("I evaluate below the evidence that Plaintiffs have provided in each of the three categories of EBT data, or 'attachments,' on which the FNS has relied. After doing so, I conclude that while Plaintiffs have created a genuine issue of fact as to Attachment 1, they have not with respect to Attachments 2 and 3. Thus, I grant summary judgment as to the issue of whether Plaintiffs were engaged in trafficking.").

Even when asserting blanket rebuttals to proffered evidence of trafficking, "the accused store [has] to proffer competent evidence, not merely conclusory generalizations." Irobe, 890 F.3d at 380 n.3. Generalized observations about the store and customers' typical practices

"lack force in the face of ample transaction data. It is common ground that '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position' is not enough to ward off summary judgment." Id. at 380 (citing Anderson, 477 U.S. at 252, 106 S. Ct. at 2512). Consistent with the above, the court will evaluate Cheema's submitted evidence in light of the circumstantial evidence submitted by the USDA. Since Cheema's evidence is not significantly probative such that a jury could reasonably find for Cheema's at trial with regard to each of the sets of allegations, summary judgment in favor of the USDA is appropriate.

**C.    Discussion**

**1.    Liability**

As addressed more fully below, this court finds here what the First Circuit affirmed in the factually similar case of Irobe. "The Store has not meaningfully rebutted the compelling inferences suggested by the agency's mass of circumstantial evidence. Even when drawing all reasonable inferences in favor of the Store, no rational factfinder could conclude that the Store ha[s] demonstrated by a preponderance of the evidence that the finding of trafficking was improvident." Id. at 381.[5] In this proceeding, the USDA set forth four sets of behaviors as the basis for its trafficking finding. The court will address each in turn, along with the rebuttal

---

[5] Cheema's contests the factual comparison between the store in Irobe and itself. (See, e.g., Pl. Mem. at 20-21 ("[The scenario in Irobe was] entirely dissimilar from the timeline presented with Cheema's store, as Cheema's has been opened and operating since 1994, and operating as a SNAP retailer since approximately 1997. In other words, Cheema's operated as a SNAP retailer without significant issue for nearly eighteen (18) years.... Cheema's remains a viable business despite the case at bar, while the entity referenced in Irobe appears to be out of business.")). This court fails to see how Cheema's previous conduct, or the fact that it is still in operation, negates the comparison between the evidence of trafficking in Irobe and the evidence found by FNS here.

evidence submitted by Cheema's for each.  This court concludes that Cheema's has failed to meet its burden with regard to each category.

### (a)      EBT Transactions Made Too Close Together to be Credible

USDA first identifies 62 pairs of transactions made within ten minutes or less, submitting that these transactions were made too closely together, and, consequently, evidence trafficking instead of actual sales.  (DF ¶ 59).  Of the 62, sixteen were made in under two minutes and seven were made within 90 seconds or less.  (Id. ¶ 60).  Notably, many of these transactions were for amounts totaling hundreds of dollars each.  (Id.).

USDA argues that these transactions lack credibility on their face and further lose credibility in light of the limitations on Cheema's physical store.  The USDA specifically cites to Cheema's lack of carts to carry large purchases, the lack of scanners at checkout, the existence of a single cashier calculating items on a calculator, and small counterspace.  The court agrees with the USDA that each of these factors would make it very difficult, if not impossible, for a cashier to complete multiple large transactions in quick succession.

These irregular sets of transactions create strong circumstantial evidence of trafficking. See Irobe, 890 F.3d at 379 (evaluating a similar set of purchases made in quick succession and concluding that "[g]iven normal shopping behavior, the practical realities of shopping at the Store . . . and the availability of only a single clerk, these paired transactions raise obvious concerns."); Famous Int'l Mkt., 2018 WL 3015249, at *13 ("without a large counter space, conveyor belt for customers to place items, an optical scanner to scan products into the cash register system, and bagging area[,] and with only one cash register, it is highly unlikely the Market would be able to process not only transactions in quick succession but transactions in

quick succession of high dollar amounts.").  Cheema's can survive summary judgment by pro-

viding viable explanations, and evidence thereof, which dispute the government's evidence.  Cf.

id., at *11 ("The Market's bald argument it processed more repetitive transactions because it

remained open longer than the comparison stores fails.  The Market does not adduce evidence

its customers shopped more frequently at the Market because of its store hours.").

Cheema's denies that the rapid transactions provide sufficient evidence of trafficking.  In

support thereof, Cheema's first asserts that "[l]arge, rapid transactions are [ ] explained by the

fact that many EBT shoppers carpooled and/or shopped in large groups at Cheema's."  (Pl.

Mem. at 23).  Cheema's also disputes the USDA's related conclusions drawn from the physical

store, arguing that "[t]he counter space and store size of Cheema's are perfectly sufficient to

accommodate the business model of serving primarily fresh and frozen meat at Cheema's."  (Id.

at 25).

In making these arguments, Cheema's relies on its submitted Customers' Affidavit,

through which affiants explain that "[o]ftentimes, either I would carpool, or I would observe

other individuals carpooling, in order to shop at Cheema's in large groups."  (Customers' Aff.

¶ 7).[6]  First, it is not clear to the court exactly how shopping in large groups explains repetitive

large transactions when a store clerk would be required to tally items between each purchase

regardless of crowd size.  Second, even if it were possible for a cashier to check out large groups

of customers in such rapid succession, and even if the store's physical characteristics did not

preclude such a conclusion, Cheema's submitted assertions from customers are too generalized

---

[6] This paragraph is only included in Isam's Affidavit (Docket No. 63-1 at 19), as it appears to the court
that Asim's Affidavit (Docket No. 63-1 at 17) is missing the second page (including a signature).

to effectively refute the USDA's data. See Famous Int'l Mkt., 2018 WL 3015249, at *11 ("the customers do not refute or provide detail on specific purchases at issue and do not provide detail corroborating the Market's belief customers made repetitive transactions because [of] the Market's store hours. Without supporting evidence, the Market's conclusory and generalized assertion does not create a genuine issue of material fact."); see also Duchimaza, 211 F. Supp. 3d at 435 ("Plaintiffs' assertion that members of the same family would visit the store on the same day is simply a conclusion; Plaintiffs cite no examples, provide no data, and do not even attempt to account for the specific transactions the FNS identified in this category."). Cheema's has not come forward with specific and credible evidence to show the court that a genuine issue exists as to whether such shopping practices regularly occurred at Cheema's. Moreover, Cheema's has not demonstrated for the court exactly how such practices explain the 62 transactions submitted to the court by the government.

Cheema's next attempts to rebut the Agency's data evidence by claiming that large amounts of orders are placed over the phone and are pre-tallied, allowing for large orders to be rung up quickly. As evidence, Cheema's does not submit records of phone orders from the review period, but instead submits a recent phone order book containing entries Cheema's claims are "substantially similar to the phone order notebook from the months in question." (Pl. Mem. at 10 (referring to Ex. C (Docket No. 65))). Those records, most of which are not legible, lack important indicators such as time, date, and payment method used for each of the orders. Moreover, even if the court were to accept the records as evidence of high phone order volume, Cheema's submits no evidence showing that these phone orders actually

resulted in rapid transactions, or transactions involving hundreds of dollars, or otherwise

explaining the government's data.

Cheema's also relies on its Owners' Affidavit for this phone order argument. Therein,

the Cheema brothers aver that:

> Many of our customers place orders with us over the phone, and then
> come in at a later time to pick up their order. When the customers arrive,
> we already have the total price of their purchase calculated. While coming
> into the store to pick up their order, customers often make purchases
> beyond the meat. Oftentimes, these customers swipe their cards twice:
> once for the items ordered by phone, and a second time for the items
> picked up in-person.

(Owners' Aff. ¶ 12). This generalized claim is not enough to survive summary judgment and, as

addressed above, Cheema's submits no further evidence linking the alleged large volumes of

phone orders to quickly successive transactions at the store, and has not explained how placing

orders ahead of time speeds up the checkout of the individual purchases to the extent

indicated by defendant's data. In addition, Cheema's fails to demonstrate for the court how

the submitted order book sufficiently explains this theory from their affidavit. The indication

that orders are currently made over the phone, coupled with general assertions about

customer behavior, does not sufficiently show that Cheema's can rebut the defendant's

evidence of suspiciously rapid, large transactions in 2015.

Cheema's makes the argument that the phone records were not available to the govern-

ment during the initial investigation, contending that such a discrepancy between that record

and the one before this court warrants a denial of summary judgment. (Pl. Mem. at 9 ("While

the logistics of SNAP transactions are certain to be a factor, it becomes far less of a deterrent to

Cheema's model of operation if the phone orders placed ahead of time are taken into account,

which ARO Gwinn did not.")).  At oral argument, the plaintiff's counsel urged the court to deny the government's motion because the existence of phone orders as a part of the plaintiff's business model created a disputed material fact.  This court disagrees.

This court considers the evidence before it in light of the appropriate burden placed on the parties.  This court recognizes that it must consider evidence submitted to the court, even if it was not submitted to the Agency during its investigation.  This court further recognizes that its decision is not deferential to the Agency's investigation or findings, but, rather, that its decision is *de novo*, and that the court must review the submissions before it in order to determine whether a genuine issue of material fact exists.  Ramirez, 514 F. Supp. at 763 ("The trial de novo provision of 7 U.S.C. Sec. 2023 . . . requires the Court to examine all the issues raised and not merely to determine whether the administrative findings are supported by substantial evidence on the record.  The Court must reach its own factual and legal conclusions and is not limited to matters considered in the administrative findings.); Irobe, 890 F.3d at 377 ("summary judgment is warranted if a nonmovant who bears the burden on a dispositive issue fails to identify significantly probative evidence favoring his position." (internal citation and quotation omitted)).  Nevertheless, where, as here, the evidence offered by the plaintiff does not demonstrate credible evidence that an issue of fact exists, summary judgment is appropriate.  Here, after considering the plaintiff's explanations, this court finds that the fact of rapid, paired transactions has not been refuted, and their existence properly supports the inference of trafficking.

### (b)    Multiple Transactions Made From the Same EBT Account in Short Time Frames

The USDA next identifies 62 instances in the review period where the same household made multiple transactions, each set of which were made within a timeframe of 18 hours.  (DF

¶ 63). Fifty-one of those transactions were part of sets of purchases that occurred within a timeframe of ten minutes or less. (Id. ¶ 64). Similar to their argument related to the first group of transactions, Cheema's contends that these transaction sets are explained by the fact that many customers order items over the phone and then make a separate purchase of goods that they find once they arrive at the store. (Customers' Aff. ¶ 2 ("When purchasing groceries at Cheema's Supermarket, it would not be uncommon for me to place orders ahead of time by phone to help expedite wait time and check out process.), ¶ 3 ("When purchasing groceries at Cheema's Super Market [sic] that I placed an order for ahead of time, it would not be uncommon for me to make two (2) or more transactions during one (1) visit.")). Cheema's also explains that some customers complete two transactions because they forget items the first time around. (See Pl. Mem. at 26 ("rapid transactions in these instances are indicative of customers' shopping behavior, as opposed to fraud.") (referencing charts at Ex. D showing that some of Cheema's customers exhibited similar behavior at other stores)).

USDA questions Cheema's rationales for these patterns because in eleven of the transactions, the latter purchase was for an amount equal to or greater than the first. (See DF ¶ 124). This court is equally unconvinced by Cheema's explanations, particularly in light of the size of the second transactions in many of the sets. (See, e.g., A.R. 72 transaction nos. 138, 139); see Famous Int'l Mkt., 2018 WL 3015249, at *12 ("Even if we were to disregard the size of the second transaction in relation to the first, the high dollar amount of the second purchases alone cannot support an inference the customer purchased forgotten items.").

Further, the Customers' Affidavit is generalized and does not suffice to explain the sheer number of repetitive transactions from single beneficiaries. Similarly, Cheema's argument that

such customer behavior "is not commonplace to Cheema's alone" is not persuasive.  (See Pl.

Mem. at 6).  Thus, Cheema's has submitted charts showing EBT customers making multiple

rapid transactions at other stores besides Cheema's.  (Id. at Exs. A, D).  However, the fact that

suspicious repeat transactions occurred at different stores during the same time period as FNS'

investigation of Cheema's is not credible evidence that the transactions at Cheema's were the

result of normal shopping behavior instead of trafficking, nor does it make the ones that

occurred at Cheema's any less suspect.  Furthermore, the court has no context for those other

transactions, and Cheema's offers no evidence of the fact that the transactions at Cheema's or

at the other stores were actually legitimate SNAP purchases despite their suspicious appear-

ance.  Cheema's assertion that the transactions at other stores were never investigated is

neither corroborated nor determinative of the nature of the Cheema's transactions in question

here.  (See id. at 11 ("The chart analysis clearly shows analogous purchase patterns by EBT

customers with no ramifications, yet Cheema's received an onerous punishment for the same

patterns of operation.")).

In sum, Cheema's generalized statements about typical customer behavior is insufficient

to establish a genuine issue of material fact.  The existence of a large number of multiple trans-

actions made from the same EBT account in a short time frame is further evidence of

trafficking.

    (c)    **Use of Most or All of a Household's Benefits in
Short Time Frames**

The USDA's third category of violations consists of 110 occasions on which individual

beneficiaries used most or all of their monthly allotment in an unusually short period of time.

(DF ¶ 65).  Forty-five of these 110 transactions were for the precise amount of remaining

benefits in a particular account.  (Id. ¶ 66).  FNS points to a government study to show that, in

contrast, an average beneficiary takes three weeks to spend 90% of their monthly SNAP benefit

allotment.  (DF ¶ 93).  Cheema's contests the use of the study, arguing that "common sense

dictates that many shoppers will deviate from the average in a ten-year-old report."  (Pl. Mem.

at 26).  Cheema's further argues that it has "illustrated an ad nauseum of uncommon

purchasing patterns of its patrons involving large purchases of halal meat to last weeks or

months, a scenario that is uncommon in most compared stores illustrated by the Defendant."

(Id.).  Finally, Cheema's invokes the Customers' Affidavit wherein it is averred that "[w]hen

using my household EBT card to make purchases at Cheema's Super Market [sic], it would not

be uncommon for me to spend more than half, if not all, of my monthly EBT benefits in one

transaction."  (Customers' Aff. ¶ 6).[7]  Cheema's again fails to rebut the USDA's data with

concrete evidence explaining these suspect transactions.  Generalized statements claiming that

entire SNAP allotments are spent on purchases of monthly supplies of meat is not sufficient to

create a genuine issue of fact regarding these 110 alleged violations.

     The instant situation is virtually identical to the facts in Irobe, where the First Circuit

affirmed a grant of summary judgment for the government despite similar assertions by the

affected store.  As the Court held:

> Indeed, the Store relies almost entirely on Irobe's deposition testimony,
> in which he offered generalized, non-specific observations about his
> customers' shopping habits.  He testified, for example, that his customers
> sometimes would purchase expensive items (such as goat or camel meat) or
> buy rice in bulk.  This testimony, the Store argues, creates a genuine dispute
> about whether the 205 EBT transactions exceeding $174 were for SNAP-

---

[7] Again, this paragraph is only included in Isam's Affidavit (Docket No. 63-1 at 19), as it appears to the
court that Asim's Affidavit (Docket No. 63-1 at 17) is missing the second page.

> eligible foodstuffs....  These arguments lack force in the face of the ample transactional data.  It is common ground that the mere existence of a scintilla of evidence in support of the plaintiff's position is not enough to ward off summary judgment.  Where the plaintiff has the burden of proof, there must be evidence on which the factfinder could reasonably find for the plaintiff.  There is no such evidence here – and generalized conclusions, such as Irobe has proffered, cannot fill the void.

Irobe, 890 F.3d at 380-81 (internal citations and quotations omitted).  Similarly here, the generalized comments in Cheema's briefing and as produced by way of affidavit are not enough to show a credible rebuttal to the USDA's transaction data.  The fact that the court in Irobe had only the owner's deposition whereas Cheema's has submitted affidavits from both the owners and customers does not change this analysis since these affidavits are similarly very generalized.

      **(d)**      **Unusually Large Transactions**

The USDA's final set of suspect transactions consists of 596 EBT transactions during the review period of over $47 each, which the USDA deems abnormally large.  (DF ¶ 67).  Of these, 437 were for over $100.  (Id. ¶ 68).  FNS compared Cheema's transaction data with that of other similar stores.  The government observed that "a review of the average monthly trans-actions at Cheema's as compared to other stores that sell Halal meats reveals that, during June, July and August of 2015, Cheema's shoppers spent more than *double* per transaction than shoppers spent at any other store."  (Id. ¶ 127 (emphasis in original) (showing that while Cheema's average transaction was $134.99, other stores which sold Halal meat averaged $50, $35.28, $54.31, $40.12 and $37.86)).  Moreover, when compared generally to other markets classified as medium grocery stores, Cheema's transaction data showed sales of over 300% the average purchase amount.  (Id. ¶ 126).

Cheema's responds to this data by arguing that it was compared to inappropriate stores. (Pl. Mem. at 26-27 ("While the inventory may have indicated that status as a 'medium' grocery store was warranted, the amount of meat sold per week should have warranted classification as a specialty store, which would then compare Cheema's revenue to more reasonably comparable figures.")).  However, Cheema's does not provide the court with data from such specialty stores showing that Cheema's numbers would be appropriate, even if classified into that category.  Cheema's simply claims that:

> [a] specialty store, as defined by FNS, is a food store 'specializing in the sale of meat products ... [which] [m]ay also carry non-food items or other food items, but such stock is incidental to the primary specialty food stock.'  Such a description may better suit Cheema's, in light of the disputed fact that 70% of Cheema's sales are for halal meat products, and it negates the Defen-dant's comparison to area MGs of similar ethnic offerings.

(Id. at 27).  This bald assertion, without more, is insufficient to negate the government's comparison to other stores selling Halal meat and does not demonstrate that Cheema's large transactions are typical of such a specialty store.  See Famous Int'l Mkt., 2018 WL 3015249, at *14 ("Even assuming the Market is well-stocked and offers international foods, the Market does not adduce specific evidence addressing why its EBT transaction data differs so greatly from the comparison stores when the comparison stores carry roughly the same inventory.").

At oral argument, Cheema's attorney argued that the comparisons between Cheema's and the other grocery stores was unfair because Cheema's was compared to stores like Stop & Shop and BJ's which do not carry specialty Halal meat.  The point misses the comparison at issue.  The government did indeed reference purchases at Stop & Shop and BJs in arguing that the purchases at Cheema's were suspiciously large.  However, the government makes that comparison to show that "individuals shopping at Cheema's shopped at other larger or

comparable stores during the relevant time period, and spent far less money." (Def. Mem. (Docket No. 53) at 17). That inter-customer comparison is separate and apart from the USDA's argument that the individual transactions at Cheema's exceeded those at both other stores selling Halal meat and other stores within Cheema's classification category of medium grocery store. Cheema's has not submitted evidence to show that the government's comparison to average sales at those stores was inappropriate.

Cheema's next attempts to explain the large transactions as a result of purchases surrounding certain holidays. (Pl. Mem. at 27 ("many of the purchase dates for the large transactions correlate with delivery dates of hundreds to thousands of pounds of meat, and/or correlate with the religious and cultural holidays recognized by the vast majority of Cheema's customers. Not only did many of the customers spend comparable amounts at other Halal stores, but most made quite significant transactions at non-halal stores.")). First, if customers are indeed spending large amounts at other Halal stores and non-Halal stores during this time of the year, this fact contradicts Cheema's assertion that its customers buy monthly groceries in bulk at Cheema's. Second, FNS found during its investigation that "[SNAP] redemptions during the review period (June, July and August of 2015) were not significantly different from those [at Cheema's] in non-holiday months outside the review period." (DF ¶ 96). This contradicts Cheema's claim that the holidays created irregular transaction patterns.

Cheema's next argues that "[b]y looking at the receipts for when Cheema's purchased [its] meat, and then viewing customer purchases within the next one to two days, it becomes clear that these excessively large purchases originate around the time that Cheema's received fresh meat deliveries." (Pl. Mem. at 12). The Cheema brothers aver in the Owners' Affidavit

that "[d]eliveries of both fresh and frozen meat are made one to three times per week to [the] store." (Owners' Aff. ¶ 7). Cheema's, however, submits no specific evidence to show that this is true. In fact, Cheema's contends, without evidentiary citation, that "[w]hile there are 596 claims of 'excessively large purchases,' 494 of these occurred either on the date of the fresh meat delivery, or within the two days after, or within two days of the Fourth of July for any festivities occurring after sundown. This leaves merely 100 large purchases that do not correlate with delivery dates or the Fourth of July. Many of them correlate with religious holiday dates." (Pl. Mem. at 12-13). As stated above, Cheema's has not submitted sufficient evidence to give credence to the claim that the holidays were a driving force behind the large transactions in the review period. Thus, even accepting Cheema's claim regarding purchases near delivery dates to be true, there remain approximately 100 uncontested alleged violations, more than enough to warrant the USDA's charge. In addition, this argument ignores the Agency's finding that the refrigeration space was insufficient to store thousands of dollars of fresh meat per day, as Cheema's contends. (See DF ¶ 85).

Cheema's further defends the high value transactions by claiming that:

> [o]n average, much of our inventory is sold at a significant markup due to the nature/designation of the specialty foods that we provide to our customers. Upon information and belief, Middle Eastern foods/brands often cost substantially more to ship to supermarkets than more common-place food items. On average during the months in question, our store sold chicken at a 69% markup, beef at an 81.5% markup, lamb at a 26.5% [markup], and goat at a 20% markup.

(Owners' Aff. ¶ 10). FNS had initially assumed a 40% markup on goods in estimating that, based on Cheema's submitted invoices, the store had an inventory during the review period of $274,307.46 worth of product. (DF ¶ 102). The actual amount of sales were $113,148.62 in

SNAP benefits and $310,007.10 in credit card sales, for a total amount of $423,155.72, exclusive

of cash sales.  (DF ¶ 103).  In making the claim that the 40% markup estimate was too low,

Cheema's fails to show that the higher markup sufficiently explains the serious discrepancy in

projected and actual sales, or how it accounts for specific instances of unusually high purchases.

Thus, the claim from Cheema's owners that Cheema's meat is more expensive than the govern-

ment assumes is not enough to create a genuine issue on summary judgment.  <u>Famous Int'l

Mkt.</u>, 2018 WL 3015249, at *14 ("The Market's vague and generalized argument 'some combi-

nation' of its food offering, inventory, and pricing justifies the 400 large transactions at issue is

insufficient to refute the EBT data and create a genuine issue of material fact.").

Cheema's also contests the above government calculations by asserting that the govern-

ment's tabulation of available inventory was lacking because it excluded invoices Cheema's

could have provided absent bad record keeping efforts.  Cheema's has proffered the following:

> The Agency's consideration that Cheema's failure to demonstrate inventory
> for nearly $150,000 in sales over a three month period as indicative of
> trafficking is conjecture.  The Agency's argument assumes that failing to
> include a large number of invoices equates to trafficking.  On the contrary,
> had Cheema's kept better records of their invoices, the records would have
> shown inventory for the $150,000 in sales that the Agency has flagged as
> potential trafficking.

(Pl. Mem. at 7 (internal citations omitted)).  This argument does purport to address the fact that

sales generally exceeded the government's estimation of inventory.  The numbers presented by

Cheema's show Cheema's credit card sales alone ($310,007.10) surpass the government's

expected sale potential based on store inventory ($274,307.46).  However, Cheema's has

neither produced invoices explaining the government's miscalculations nor submitted evidence

of inventories for other time periods similar to the one under investigation for the court to

consider by comparison.  Cheema's assertion that bad record keeping explains the apparent lack of inventory for the amount of sales and high value transactions Cheema's experienced ignores the burden placed on Cheema's at this stage in this proceeding.  In light of the set of high volume transactions produced by the government, it is Cheema's burden to rebut the suspicion that arises therefrom with sufficient evidence.  Had Cheema's submitted invoices to this court showing its ability to sell at such a volume, that evidence may have been enough to survive summary judgment on this set of transactions.  However, the assertion that Cheema's failed to maintain those records, without more, is insufficient.  See Irobe, 890 F.3d at 378 ("A store is in the best position to show what actually happens on its premises.  Allocating the burden of proof to the store tacitly recognizes this reality and, in the bargain, incentivizes shopkeepers to maintain accurate records of all SNAP transactions.  A contrary rule would have the perverse effect of rewarding businesses for shoddy record-keeping.").

Finally, the general claim in the Customers' Affidavit that "[w]hen purchasing groceries at Cheema's Super Market [sic], it would not be uncommon for me to make large purchases ($100.00 - $200.00 or greater) in one or two transactions usually because I was purchasing a significant amount of meat[,]" is unavailing.  (Customers' Aff. ¶ 4).  Cheema's has not shown that it can produce evidence beyond this general assertion in support of this claim.

## 2. Adequacy of Sanction

Having found that Cheema's has not submitted evidence to create a genuine issue of material fact with regard to liability for trafficking, this court turns to the appropriateness of the sanction.  The USDA disqualified Cheema's from the SNAP program.  "A reviewing court may

disturb the agency's choice of a sanction only if it finds that choice to be arbitrary, capricious, or contrary to law." Irobe, 890 F.3d at 377 (internal citations and quotations omitted).

"Permanent disqualification is the mandatory penalty for trafficking in SNAP benefits." Kashif v. United States, No. 14-30180, 2016 WL 3886164, at *6 (D. Mass. May 12, 2016) (citing 7 U.S.C. § 2021(b)(3)(B); 7 C.F.R. § 278.6(e)(1)(i)).  The USDA has discretion to instead assess a civil penalty in lieu of permanent disqualification if "there is substantial evidence that such store or food concern had an effective policy and program in effect to prevent violations of the chapter and the regulations . . . ." 7 U.S.C. § 2021(b)(3)(B).  As Cheema's has not presented the court with evidence of such a policy, the court hereby rules that the disqualification was required by statute and was not arbitrary, capricious, or contrary to law.  This court affirms the assigned penalty.

## IV.  CONCLUSION

For all the reasons detailed herein, this court hereby ALLOWS the USDA's Motion for Summary Judgment (Docket No. 52).

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge